UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEUTIAN CAPITAL PARTNERS, LLC,

                        Plaintiff,

                -against-

EDWARD HUGLER, sued in his official capacity,
Secretary, United States Department of Labor;
UNITED STATES DEPARTMENT OF LABOR;
WAGE AND HOUR DIVISION, United States
Department of Labor Employment Standards
Administration; and ADMINISTRATOR, United
States Department of Labor Employment
Standards Administration Wage and Hour
Division,

                        Defendants.

OPINION AND ORDER

16 Civ. 5149 (ER)

Ramos, D.J.:

      Aleutian Capital Partners, LLC ("Plaintiff" or "Aleutian") brings this action under the

Administrative Procedures Act ("APA"), 5 U.S.C.A. § 702, seeking judicial review of a final

decision and order of the Administrative Review Board of the Department of Labor ("ARB").[1]

This action concerns Plaintiff's alleged violations of statutory and regulatory requirements

governing the H-1B temporary foreign worker program concerning its two H-1B employees.

Before this Court is Plaintiff's motion for summary judgment seeking to vacate the ARB's

---

[1] Edward Hugler is the current acting Secretary of the Department of Labor, and is substituted for former Secretary
Thomas E. Perez as a defendant in the instant action, pursuant to Federal Rule of Civil Procedure 25(d).

Also, Defendants note in passing that the Wage and Hour Division and the Administrator are improper defendants to
this action since an APA action "may be brought against the United States, the agency by its official title, or the
appropriate officer" and these Defendants do not qualify. *See* 5 U.S.C. § 703. Plaintiff does not address the issue in
summary judgment. In any event, the instant action is terminated on summary judgment, and thus, the Court need
not comment on this issue.

decision, and Defendants' cross-motion for summary judgment seeking to affirm the ARB's decision.

For the following reasons, Plaintiff's summary judgment motion is DENIED, and Defendants' summary judgment motion is GRANTED.

## I.     BACKGROUND

### A.  Statutory and Regulatory Background

H-1B employees are a class of non-immigrant temporary alien workers eligible to work in the United States in "specialty occupation[s]."  8 U.S.C. § 1101(a)(15)(H)(i)(b).  This visa program is governed by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(15)(H)(i)(b) and § 1182(n), and regulations promulgated at 20 C.F.R. Part 655, subparts H and I, by the Department of Labor ("DOL"), the agency that Congress charged with administering the H-1B program.

An employer intending to hire an H-1B employee must first submit a Labor Condition Application ("LCA") to the DOL.  *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730(a).  In the LCA, the employer must promise to pay the employee a specified required wage rate and provide certain working conditions.  *See* 8 U.S.C. § 1182(n)(1)(A).  The required wage rate is the higher of either the actual wage or the prevailing wage level for the occupational classification in the area of employment.  *Id.*

The regulatory framework outlines the employer's obligations with regards to satisfying the required wage obligation.  "The required wage must be paid to the employee, cash in hand, free and clear, when due. . . . "  20 C.F.R. § 655.731(c)(1).  "Cash wages paid" can only consist of payments meeting the criteria listed in 20 C.F.R. § 655.731(c)(2)(iii)-(v).  Notably, "[f]uture bonuses and similar compensation (*i.e.*, unpaid but to-be-paid) may be credited toward

satisfaction of the required wage obligation if their payment is assured (*i.e.*, they are not conditional or contingent on some event such as the employer's annual profits)." 20 C.F.R. § 655.731(c)(2)(v). There is also a timing requirement for wage payments to salaried employees:

> For salaried employees, wages will be due in prorated installments (e.g., annual salary divided into 26 bi-weekly pay periods, where the employer pays bi-weekly) paid no less often than monthly *except that*, in the event that the employer intends to use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus), the employer's documentation of wage payments (including such supplemental payments) must show the employer's commitment to make such payment and the method of determining the amount thereof, and must show unequivocally that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period. . . .

20 C.F.R. § 655.731(c)(4).

The DOL reviews LCAs for completeness and obvious inaccuracies. *See* 8 U.S.C. § 1182(n)(1). If it does not find that the LCA is "incomplete or obviously inaccurate," the DOL must certify the LCA within seven days of receipt. *Id.* Indeed, DOL is generally prohibited from investigating the veracity of the LCA prior to certification. *See, e.g.*, *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 193 (3d Cir. 2010). However, the Secretary of Labor (the "Secretary") may conduct certain compliance investigations after certification.[2] 8 U.S.C. § 1182(n)(2)(A). The Secretary may conduct investigations under the following circumstances: (1) upon receiving aggrieved party complaints under 8 U.S.C. § 1182(n)(2)(A); (2) "random investigations" of certain employers under 8 U.S.C. § 1182(n)(2)(F); (3) investigations after he personally certifies that he has "reasonable cause" to believe the employer is non-compliant under 8 U.S.C. § 1182(n)(2)(G)(i); or (4) investigations based on "specific credible information" of a willful violation of certain requirements from a reliable source under 8 U.S.C.

---

[2] The Secretary delegated to the Administrator of the Wage and Hour Division (the "Administrator") the authority to perform all investigative and enforcement functions under the INA. *See* 20 CFR 655.502; 20 C.F.R. § 655.800(a).

§ 1182(n)(2)(G)(ii). As relevant to this action, an aggrieved party complaint must be filed not later than 12 months after the latest date on which the violation occurred, but the scope of remedies may be assessed "for a period *prior* to one year before the filing of the complaint." *See* 20 C.F.R. § 655.806(a)(5) (emphasis added). If the Administrator finds that the employer has violated the wage requirements, he/she may order the employer to pay back wages to the H-1B employee. *See* 8 U.S.C. § 1182(n)(2)(D); 20 C.F.R. § 655.810(a).

The employer may challenge the Administrator's determination by requesting a hearing with an Administrative Law Judge ("ALJ"). *See* 8 U.S.C. § 1182(n)(2)(B); 20 C.F.R. § 655.820(a)-(b). The ALJ's decision may then be appealed to the ARB. 20 C.F.R. § 655.845(a).

## B. Factual Background[3]

Aleutian is a private equity investment group established in 2003 to acquire, operate, and grow middle market companies. AR 36. As relevant to the instant motions, Aleutian employed two H-1B salaried employees: Minh-Thuong Horn ("Horn") and Shakir Gangjee ("Gangjee"). *Id.* at 7-8, 36-37. Horn was employed as a market research analyst and Gangjee was employed as a financial analyst. *Id.* at 7, 37.

In March 2010, Aleutian submitted an LCA for Horn. *Id.* at 37. Aleutian represented that it would pay her the prevailing wage for market research analysts of $42,453. *Id.* It compensated Horn monthly, and thus, her monthly pro-rated salary should have been $3,537.75.

---

[3] The following facts are based the administrative record submitted under seal. Doc. 31 ("AR"). Neither party has submitted statements of undisputed facts pursuant to Local Civil Rule 56.1 in support of their respective summary judgment motions. Because this action turns entirely on the administrative record and presents only legal issues, Rule 56.1 statements are unnecessary. *See Singh v. Bd. of Immigration Appeals*, No. 15 Civ. 5541 (PKC), 2017 WL 727541, at *1 n.1 (S.D.N.Y. Feb. 23, 2017) (noting that the parties' failures to submit Rule 56.1 statements do not impede the court from adjudication of the summary judgment motions where the case turns on the administrative record and there are no factual disputes); *see also Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012) (noting that an appeal based on an administrative record presents only a question of law and thus Rule 56.1 statements are not necessary).

*Id.* at 7, 10.  However, in December 2012, she was paid $350, plus a $250.73 monthly contribution to her healthcare plan.  *Id.* at 8, 38.  On January 2, 2013, Aleutian terminated Horn. *Id.* at 8.

On August 4, 2011, Aleutian submitted an LCA concerning Gangjee, attesting that it would pay him an annual wage of $65,000 as a financial analyst (Aleutian represented that the prevailing wage was $62,566).  *Id.* at 7, 37.  He was also compensated monthly, and thus, his prorated monthly salary should have been $5,416.67.  *Id.* at 7.  However, Gangjee's salary was not given in monthly prorated installments.  *Id.* at 38-39.  In 2012, Gangjee's monthly compensation was a combination of a $3,000 base pay and a bonus calculated at 3% of any revenues earned and received by Aleutian that month.  *Id.* at 7, 38.  Accordingly, if Aleutian did not receive any revenue, Gangjee would not receive a bonus.  *Id.* at 38.  This salary structure was not reduced to writing, *Id.* at 297, in contravention of 20 C.F.R. § 655.731(c)(4).  During Gangjee's tenure at Aleutian, he was compensated the following amounts each month:

| Month/Year | Total Paid |
|---|---|
| August 2011 | $1,875 |
| September 2011 | $1,649 |
| October 2011 | $2,649 |
| November 2011 | $2,649 |
| December 2011 | $9,822 |
| January 2012 | $5,711 |
| February 2012 | $10,266 |
| March 2012 | $5,285 |
| April 2012 | $4,111 |
| May 2012 | $9,456 |
| June 2012 | $3,060 |
| July 2012 | $3,060 |

| | |
|---|---|
| August 2012 | $3,600 |
| September 2012 | $3,060 |
| October 2012 | $3,060 |
| November 2012 | $3,060 |
| December 2012 | $3,780 |

*Id.* at 38-39.  Gangjee's total annual compensation for the calendar year of 2012 was $57,509.

*Id.* at 7.  On December 31, 2012, Gangjee was terminated by Aleutian.  *Id.* at 251.

### C. Procedural Background

On January 14, 2013, Gangjee filed a complaint with the Administrator, alleging, *inter alia*, that Aleutian failed to pay him the required wage from August 6, 2011 to December 31, 2012.  *Id.* at 7, 141-43, 289-91.  The Administrator was assigned to investigate Aleutian on April 3, 2013.  *Id.* at 146.  He requested from Aleutian its public H-1B documents and payroll records for all H-1B workers it employed after January 15, 2012.  *Id.* at 146, 414.

On January 9, 2014, the Administrator issued a notice of determination.  *Id.* at 10.  He first noted that the prorated monthly installment for the prevailing wage rate of $62,566 was $5,213.82.  *Id.* at 147.  Then, he adjusted the prevailing monthly wage rate for months during which Gangjee took vacation or sick days.[4]  *Id.* at 129, 147.  The sum of these adjustments was $49,370.99 for the 2012 calendar year, which is less than the $57,509 Gangjee received for the 2012 calendar year.  *Id.* 215.  However, the Administrator did not credit any overpayments.  *Id.* at 147.  Instead, he found that Gangjee was paid less than what he was owed during four months in 2011 and six months in 2012,[5] added those deficits, and found that Gangjee was owed a total

---

[4] Notably, the Administrator found that Aleutian did not owe Gangjee any wages for August and September 2012 as Gangjee was outside of the United States during that time.  *Id.* at 39, 215.

[5] The Administrator determined that Gangjee was paid less than what he was owed during August, September, October, and November 2011, and April, June, July, October, November, and December 2012.  *Id.* at 38-39.

6

of $19,776.29^6$ in back wages.  *Id.*  The Administrator also determined that Horn was paid $2,937.02 less than the required monthly rate in December 2012.  *Id.* at 10-11, 148.  In total, the Administrator found that Aleutian owed $22,713.31^7 in back wages.  *Id.* at 148.

Aleutian challenged the Administrator's decision to an ALJ, who was referred the case on January 14, 2014.  *Id.* at 5.  Aleutian and the Administrator both moved for summary decision.  *Id.* at 6.  On July 9, 2014, the ALJ granted the Administrator's motion for summary decision, and directed Aleutian to pay $22,713.30 in back wages.  *Id.* at 11.  Specifically, he determined the following:  (1) each pay period must be viewed separately to determine compliance with the pro-rata payment requirement; (2) Aleutian failed to pay the minimum monthly wage it was required to pay Gangjee for certain months in 2011 and 2012; (3) Aleutian's contingent bonus structure did not excuse it from the pro-rata payment requirement; (4) the Administrator can look beyond one year before the filing of the complaint in awarding remedies; and (5) the Administrator did not exceed his authority by investigating Horn's compensation.  *Id.* at 8-10.

On July 23, 2014, Aleutian sought review of the ALJ's determination by the three-member ARB panel.  *Id.* at 498-502.  On June 1, 2016, the ARB issued its final decision and order, stating that the Administrator was entitled to summary decision against Aleutian.  *Id.* at 293-98.  The ARB upheld the ALJ's order in its entirety and directed Aleutian to pay $22,713.30 in back wages.  *Id.*  Notably, the ARB declined to follow an Eighth Circuit decision which held that the permissible scope of investigation arising from an aggrieved party complaint is limited to the allegations in that complaint.  *Id.* at 297; *see Greater Missouri Medical Pro-Care Providers, Inc. v. Perez*, 812 F.3d 1132, 1138-1141 (8th Cir. 2015) ("*Greater Missouri*").  One ARB member

---

[6] The ALJ subsequently noted that this amount should be $19,776.28 after correcting a minor calculation error.  *Id.* at 10, n.4.

[7] The ALJ held that this amount should be corrected to $22,713.30.  *Id.* at 10 n.5.

wrote a partial concurrence and dissent. *Id.* at 298-300. He noted that he would reverse the summary decision that Aleutian underpaid Gangjee during 2012 because violating the timing requirement does not mean that Aleutian failed to ultimately pay the amount owed in 2012. *Id.* 298-99. He further stated that the Administrator penalized Aleutian for overpaying during the first quarter of 2012. *Id.* at 299. However, the dissenting member still found that Aleutian violated the manner in which it was required to pay the LCA wage obligation to Gangjee during 2011 and the last quarter of 2012, and failed to pay all that was owed to Gangjee in 2011. *Id.* at 298.

On June 29, 2016, Aleutian filed the Complaint, initiating the instant action. Doc. 1. On July 11, 2016, it filed the First Amended Complaint. Doc. 13. On January 26, 2017, it filed a motion for summary judgment, stating that the ARB ruling was in contravention of the facts, statute and regulations. Doc. 35. On January 30, 2017, Defendants filed a cross motion for summary judgment. Doc. 37.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is only appropriate where the "materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c)(1)(A). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might

affect the outcome of the litigation under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

"Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In that situation, there can be no genuine dispute as to any material fact, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

## B. Judicial Review Under the APA

Where a party seeks judicial review of an agency action under the APA and there is only a question of law, summary judgment is generally appropriate. *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (citation omitted). Under Section 706 of the APA, legal conclusions are reviewed *de novo*. *J. Andrew Lange, Inc. v. F.A.A.,* 208 F.3d 389, 391 (2d Cir. 2000) (citing 5 U.S.C. § 706). However, the reviewing court must defer to the interpretation of an ambiguous statute adopted by the agency charged with administering it unless the interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843-44 (1984); *see also National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) ("If the statute is ambiguous . . . we defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.'") (citation omitted); *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 168 (2d Cir. 2017). Courts must also defer to the agency's interpretation of its own ambiguous regulation, even where that interpretation is advanced in a legal brief, unless the

interpretation is "plainly erroneous or inconsistent with the regulation" or when there is reason to suspect that the interpretation "does not reflect the agency's fair and considered judgment on the matter." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

For other agency findings, conclusions, and actions, a district court may "hold unlawful and set [them] aside" if they are found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). This deferential standard of review does not permit a court to "substitute [its] judgment for that of the agency." *Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 555 (2d Cir. 2009) (citation omitted). Furthermore, the reviewing court may only review evidence produced in the administrative record. *Pythagoras Gen. Contracting Corp. v. U.S. Dep't of Labor*, 926 F. Supp. 2d 490, 496 (S.D.N.Y. 2013) (citation omitted). Nevertheless, the inquiry must be "searching and careful." *Nat. Res. Def. Council, Inc.*, 564 F.3d at 555 (citation omitted). The record must show that the agency examined the relevant data and articulated a satisfactory explanation for its action and the agency decision must reveal a rational connection between the facts found and the determination. *Id.* "[A]n agency determination will only be overturned when the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Karpova v. Snow*, 497 F.3d 262, 267-68 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## III.    DISCUSSION

### A.  Gangjee's Compensation in 2012

Aleutian appeals the ARB's finding that it owes Gangjee back wages for six months in 2012 because it failed to pay the prorated required wage rate for those months.  It avers that it exceeded the required annual wage obligation for 2012, and that it was exempted from the pro-rata payment obligation under 20 C.F.R. § 655.731(c)(4).  As noted, 20 C.F.R. § 655.731(c)(4) states,

> wages will be due in prorated installments . . . *except that*, in the event that the employer intends to use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus), the employer's documentation of wage payments (including such supplemental payments) must show the employer's commitment to make such payment and the method of determining the amount thereof, and must show unequivocally that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period. . . .

Aleutian argues that the bonuses it paid Gangjee in 2012, calculated at 3% of Aleutian's revenue for each month, are "nondiscretionary payment[s]" used to supplement Gangjee's regular pay in order to meet the required wage obligation, and thus, that Aleutian was excused from paying Gangjee in prorated installments.  However, the ARB found that Aleutian failed to qualify for the exception in 20 C.F.R. § 655.731(c)(4) because, *inter alia*, it failed to provide the documentation required under that provision.  AR 297.  20 C.F.R. § 655.731(c)(4) requires the employer to provide documentation that shows its commitment to make the nondiscretionary payment and the method of determining the nondiscretionary payment amount.  It is undisputed that there is no documentation adequately memorializing Aleutian's commitment to provide the 3% bonus.  The only documentation that attempts to do so is an unsigned employment agreement.  Furthermore, the evidence Aleutian relies on—Aleutian's purported oral promise to

make bonus payments to Gangjee, monthly and annual financial statements, and Gangjee's

historical earnings record—fail to document its *commitment* to pay the 3% bonus.  Accordingly,

because it did not comply with the requirements of the provision, Aleutian was not excused from

paying Gangjee in monthly prorated installments.

The foregoing is sufficient, in itself, to reject Aleutian's objections to the ARB's finding.

However, the ARB went further and found that the bonus structure was non-compliant because it

was not "guaranteed," but rather, "completely contingent" on Aleutian's revenue.  Aleutian

argues that § 655.731(c)(4) only contains the word "nondiscretionary" and that

"nondiscretionary" does not mean non-contingent.  Therefore, Aleutian argues, nondiscretionary

bonus structures may excuse an employer from abiding by the prorated payment obligation under

20 C.F.R. § 655.731(c)(4).  Thus, the issue before this Court is whether Aleutian's commitment

to make "nondiscretionary" bonus payments as provided for in 20 C.F.R. § 655.731(c)(4)

excuses Aleutian from otherwise guaranteeing Gangjee's salary and ensuring that no part of it is

contingent as provided in 20 C.F.R. § 655.731(c)(2)(v).

In interpreting an agency's regulations, the Court must first determine whether the

language is ambiguous.  *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819

F.3d 42, 53 (2d Cir. 2016) (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000)); *see also*

*Mullins v. City of New York,* 653 F.3d 104, 105-06 (2d Cir. 2011).  If it is, then the Court must

defer to the agency's interpretation, provided by the ARB in this action, unless it is plainly

erroneous or inconsistent.  *Id.*

Aleutian states that the meaning of "discretionary" is expressly provided in 29 C.F.R.

§ 778.211.[8]  However, 29 C.F.R. § 778.211(a) is a Fair Labor Standards Act ("FLSA") regulatory

_____

[8] Specifically, 29 C.F.R. § 778.211 defines discretionary payments as payments for which "both the fact that
payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or

provision that has no bearing on 20 C.F.R. § 655.731(c)(4). 29 CFR § 778.211(a) concerns discretionary payments as it relates to the FLSA concept of the "regular rate" at which an employee is compensated. As Defendants correctly point out, the legislative history demonstrates that FLSA "regular rate" principles are not automatically applicable to INA and DOL regulations. Specifically, in 1993, the DOL considered and rejected using FLSA's "regular rate" principles for the H-1B regulations.[9] *See* 58 Fed. Reg. at 52155. Accordingly, the definition of "discretionary" in 29 C.F.R. § 778.211(a) is inapplicable.

There is no express definition of the term "nondiscretionary payment" in 20 C.F.R. § 655.731(c)(4) or any other provisions concerning the H-1B program, nor does the context illuminate the specific meaning of the term. The one example of such nondiscretionary payments in the provision, a quarterly production bonus, is insufficient to nudge the meaning of the term from ambiguity to clarity. Indeed, Aleutian itself sought to define this term by looking to an FLSA regulatory provision outside of the provision and the entire H-1B regulatory framework.

Aleutian argues that nondiscretionary and non-contingent cannot have the same meaning because the term "non-contingent" is used separately in a different sub-provision, 20 C.F.R. § 655.731(c)(2)(v). It avers that if the agency intended to mean "non-contingent," it could have easily used that word. The Court notes that this argument has some force, but falls short of showing that the ARB's interpretation is thus *plainly* erroneous or inconsistent. Moreover, ARB's interpretation that even a nondiscretionary payment must be guaranteed and non-

_____

near the end of the period and not pursuant to any prior contract, agreement, or promise[,] causing the employee to expect such payments regularly."

[9] Although a different proposed criteria that was considered instead was not adopted, *see* 59 Fed. Reg. 65646, 65652, the fact that the DOL rejected FLSA principles still stands.

contingent is reasonable in the context of H-1B employee compensation.  For example, the ARB's interpretation is supported by the fact that § 655.731(c)(4) requires employers seeking to make nondiscretionary payments to show "unequivocally" that the required wage obligation was "met for prior pay periods" and "will be met for each current or future pay period."  It is reasonable to conclude that such showing can be made only if the nondiscretionary payments are guaranteed and not contingent.  Accordingly, the Court defers to the ARB's interpretation.  Here it is undisputed that the bonus structure was contingent, and not guaranteed.[10]

It is undisputed that Aleutian did not pay Gangjee the correct prorated installments for six months in 2012.  A prior ARB decision states that each pay period[11] must be viewed separately, and that no credit can be given for overpayments in certain months.  *See Adm'r v. Wings Digital Corp.*, 2005 WL 774014, at *11 (DOL Off. Adm. App. Mar. 21, 2005), *appeal dismissed on other grounds*, 2005 WL 1745152, at *3 (DOL Adm. Rev. Bd. July 22, 2005).  Although Aleutian protests that this holding was not grounded in any statute, regulation, or binding precedent, it does not provide any reasons why the holding is not warranted *Auer* deference.  Indeed, the Court finds that 20 C.F.R. § 655.731(c)(4) is silent on whether overpayment in certain months can be credited to excuse deficiencies in other months.  Furthermore, Defendants assert that the

---

[10] Defendants further argue that 20 C.F.R. § 655.731(c)(2)(v) separately bars contingent bonuses from being counted towards the required wage obligation. 20 C.F.R. § 655.731(c)(2)(v) states that "future bonuses and similar compensation (ie., unpaid but to-be-paid)" can contribute towards the required wage obligation if the payment is "assured," in other words, if they are "non-conditional or non-contingent."  Aleutian asserts that 20 C.F.R. § 655.731(c)(2)(v) only applies to not-yet-paid bonuses, and does not apply to bonuses at issue here since they have all been paid.  The Court agrees with Aleutian that the individual bonuses at issue are not "future" bonuses. However, it is also inescapably true that the bonus structure was invalid from the start under 20 C.F.R. § 655.731(c)(2)(v) because it contemplated future, completely contingent bonuses to meet the required wage obligation.  Since the DOL must certify LCAs within seven days of receipt unless they are incomplete or contain obvious inaccuracies, *see* 8 U.S.C. § 1182(n)(1), and the LCA did not reference the bonus, DOL's initial certification of the LCA concerning Gangjee's compensation cannot save the bonus structure at issue here.

[11] Aleutian argues that the relevant "pay period" is a year, but the plain language of 20 C.F.R. § 655.731(c)(4) indicates otherwise. 20 C.F.R. § 655.731(c)(4) states that each prorated installment is its own pay period. *Id.* ("26 bi-weekly pay periods, where the employer pays bi-weekly").

principle in *Wings Digital* prevents employers from paying its employees nominal salaries for most of the year and a lump sum at the end of the year, and assures H-1B employees that they will receive a particular amount each month.  The Court finds this interpretation to be reasonable and not plainly erroneous or inconsistent with the agency's regulations and thus defers to the ARB.  Because Gangjee was not paid the prorated wage amount for six months in 2012, Aleutian was in violation of its prorated wage requirements for those months.[12]

### B. Gangjee's Compensation in 2011

Aleutian also contends that the Administrator improperly extended the scope of the investigation to January 2011.  Under 8 U.S.C. § 1182(n)(2)(A), "[n]o investigation or hearing shall be conducted on a complaint concerning . . . a failure [to meet conditions in the LCA] or misrepresentation [in the LCA] unless the complaint was filed not later than twelve months after the date of the failure or misrepresentation, respectively."  Since Gangjee submitted his complaint to the Administrator on January 14, 2013, Aleutian states that the Administrator lacked the ability to investigate and impose back wages for any alleged violations prior to January 14, 2012.

Aleutian's argument fails.  Once a complaint is timely filed, the Administrator may assess back wages for a period "prior to one year before the filing of a complaint."  20 C.F.R. §

---

[12] There is an additional dispute concerning how the exception to the prorated installment requirement operates. Defendants argue that even if the exception available through § 655.731(c)(4) applies, an employer must show that the H-1B employees have been paid and will be paid at least one-twelfth of the annual required wage each month. Aleutian argues that the Defendants' position reads out the fact that the provision expressly allows quarterly production bonuses to help reach the required wage obligation.  It contends that overpayments on certain months during which these bonuses are paid can be credited towards other deficient months.  The Court recognizes that there is some ambiguity in the construction of this exception, and finds that Aleutian's argument in this regard would have more force if the payments here were structured so that Gangjee was never in a deficit position.  For example, the Administrator's challenge would be more difficult to sustain if Gangjee was paid his entire annual salary of $65,000 on day one of the year, than if he were paid the entire amount on the last day of the year. However, the Court need not reach this issue as Aleutian's bonus structure does not qualify as nondiscretionary payments for other reasons discussed above.

655.806(a)(5).  The twelve months requirement is only a jurisdictional limitation, and does not affect the scope of remedies available to the Administrator.  *Id.*  There is no dispute that the complaint was timely filed since the latest violation occurred in December 2012.  Accordingly, the scope of remedies for Aleutian's violations may include back wages for 2011 under 20 C.F.R. § 655.806(a)(5).  Aleutian does not argue that its failure to pay the prorated monthly salary to Gangjee in 2011 is otherwise excused.  Therefore, the Court affirms the ARB's finding that Aleutian owes back wages that were due to Gangjee in 2012 and 2011, in the amount of $19,776.28.

### C. Horn's Compensation in December 2012

It is undisputed that the Administrator's investigation was initiated based on Gangjee's aggrieved-party complaint pursuant to 8 U.S.C. § 1182(n)(2)(A), which states:

> the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application.  Complaints may be filed by any aggrieved person or organization (including bargaining representatives).  No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.  The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such      a      failure      or      misrepresentation      has      occurred.

Aleutian argues that the statute only allows investigation into the specific allegations in the complaint as they pertain to Gangjee.  It asserts that the Administrator violated this statute when he sought documents that did not concern Gangjee, and asks the Court to invalidate the award of Horn's back wages.  Defendants argue that the DOL has the authority to determine the scope of an investigation after receiving an aggrieved party complaint.

As discussed above, *Chevron* deference is appropriate where the statute is ambiguous or Congress is silent on the specific question at issue.  *Woods*, 864 F.3d at 168; *see also City of*

*Arlington v. FCC*, 569 U.S. 290, 296-300 (2013) (noting that the Supreme Court has employed *Chevron* deference where an agency adopts a construction of a jurisdictional statutory provision it administers). When engaging in statutory interpretation, courts must "begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) (citations omitted). "[W]hen deciding whether the language is plain, [courts] must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (internal quotations omitted). If, by doing so, the plain meaning of the statutory language can be ascertained, courts must not look to extrinsic materials such as legislative history. *Id.* at 2503; *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012) ("Even the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."); *see also In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009) ("We turn to the legislative history only when the plain statutory language is ambiguous or would lead to an absurd result") (internal quotations and citation omitted). If the statute is ambiguous or Congress was silent on the issue at hand, courts must defer to the interpretation of the agency charged with administering the statute unless the interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

Aleutian relies on *Greater Missouri*, an Eighth Circuit decision, to support its argument that the plain language of 8 U.S.C. § 1182(n)(2)(A) only allows investigation into the specific allegations of the aggrieved-party complaint as it concerns the complainant. In *Greater Missouri*, an employee filed an aggrieved-party complaint alleging that the employer violated several H-1B requirements. *Greater Missouri*, 812 F.3d at 1134. Of those allegations, the Secretary found that there was reasonable cause to investigate only one charge—that the

employer required or attempted to require the complainant to pay a penalty for terminating her employment early. *Id.* On the basis of that individual employee's complaint, the DOL conducted a "full investigation under the H-1B provisions of the [INA] to see if there were violations to any employee during the relevant time period." *Id.* (modifications omitted, quotations omitted). The Secretary requested sixteen different subcategories of evidence related to the employer's H-1B program and its H-1B employees, which the Eighth Circuit characterized as a "sweeping investigation." *Id.* at 1134, 1139. At the conclusion of the investigation, the Secretary awarded back wages to forty-four employees after finding additional violations of the H-1B program not alleged in the original complaint. *Id.* at 1134-35. Specifically, the Secretary determined that that the employer improperly failed to pay required wages and made improper deductions from wages in addition to imposing early termination penalty payments. *Id.* In justifying this award, the Secretary argued that "finding of reasonable cause to investigate just one allegation by an aggrieved party automatically justifies a comprehensive investigation of the employer as a whole . . . [and their] compliance . . . in general." *Id.* at 1137. The Eighth Circuit rejected this understanding of the DOL's authority. It held that the plain language of § 1182(n)(2)(A) does not "authorize an open-ended investigation of the employer and its general compliance without regard to the actual allegations in the aggrieved-party complaint." *Id.* at 1138. However, the Eighth Circuit expressly declined to answer the question of whether the Secretary may modify or expand an investigation based on an aggrieved-party complaint if "additional violations . . . come to light during a lawfully initiated and properly limited aggrieved-party complaint investigation." *Id.* at 1139. The Eighth Circuit further stated that it did "not pretend to 'dictate the exact contours of' an aggrieved-party investigation, [and that it is] satisfied [its] decision does not require the Secretary to ignore other potential violations it discovers in the course of a lawful

investigation." *Id.* at 1140.

The ARB declined to follow *Greater Missouri* in the instant case, stating that 8 U.S.C.

§ 1182(n)(2)(A) provides broader investigatory powers than the Eighth Circuit recognized, and

that it is not bound to this Eighth Circuit decision since the matter arises in New York, which is

part of the Second Circuit. Defendants further argue that Congress delegated to the Secretary the

authority to establish a *process* for the investigation, 8 U.S.C. § 1182(n)(2)(A), and that it has the

authority to determine the appropriate scope of investigation pursuant to that delegation.

Reading 8 U.S.C. § 1182(n)(2)(A) in its entirety, the Court finds that while the provision

requires investigations arising from aggrieved-party complaints to be tethered to the alleged

violations, it delegates to the DOL authority to determine the appropriate process for the

investigation. In other words, Congress was silent as to what such investigation should entail in

particular, leaving that determination to the DOL. Based on this delegation of authority, the

DOL promulgated 20 C.F.R. § 655.800(b), which further delineates its investigatory authority.

The regulatory provision states:

> The Administrator, either pursuant to a complaint or otherwise, shall conduct such
> investigations *as may be appropriate* and, in connection therewith, enter and
> inspect such places and such records (and make transcriptions or copies thereof),
> question such persons and gather such information as deemed necessary by the
> Administrator to determine compliance *regarding the matters which are the subject
> of the investigation*.

20 C.F.R. § 655.800(b) (emphasis added). Importantly, it allows the DOL to conduct appropriate

investigations to obtain information that the Administrator deems necessary, thereby giving the

Administrator some level of discretion. The legislative history demonstrates that Congress was

aware that the DOL would "establish[] a system for the receipt of complaints, and their

investigation and disposition," 56 Fed. Reg. 54,720-01; 54,721 (Oct 22, 1991), and did not at any

time hence invalidate 20 C.F.R. § 655.800(b). Therefore, it is presumed that Congress did not

find this discretion to be inconsistent with the INA.  *See Boesche v. Udall*, 373 U.S. 472, 483 (1963) (examining the Secretary's conduct with respect to the Mineral Leasing Act).  The legislative history further demonstrates that Congress gave the DOL thorough investigatory authority in order to strike a balance between competing interests.  56 Fed. Reg. 54,720-01; 54,721 (Oct 22, 1991).  In order to minimize interference with an employer's ability to hire H-1B employees and provide greater protections under the H-1B program at the same time, Congress created a system of minimal front-end review coupled with more robust back-end investigations.[13]  *Id.*

Here, the Administrator deemed that it was necessary to procure information concerning the two H-1B employees at Aleutian in ascertaining whether Aleutian abided by its required wage obligations and requested "immigration documents and payroll records for all H-1B workers it employed after January 15, 2012" from Aleutian.  AR 146.  The Court finds that the DOL's determination concerning the scope of the investigation was not arbitrary, capricious, or manifestly contrary to the statute, but rather, was appropriately tailored to the alleged violation at issue—Aleutian's alleged failure to pay the required wages during a defined period of time.  It is not alleged that the Administrator inquired into any other types of misconduct Aleutian may have engaged in, or required broad swaths of documents of tenuous relevance.  The scope of the investigation was also naturally limited by the fact that Aleutian had only two H-1B employees

---

[13] Specifically, the DOL stated during the public comment period for regulations governing the filing and enforcement of LCAs that "[t]he Department believes that Congress, in enacting the Act, intended to provide greater protection than under prior law for U.S. and foreign workers without interfering with an employer's ability to obtain the H-1B workers it needs on a timely basis.  Accordingly, the Department is providing that a labor condition application be accepted if it is complete and that DOL review be limited to whether the application is complete, and whether the Wage and Hour Division (Administrator) has previously disqualified the employer from employing H-1B workers, thereby minimizing the time it takes to obtain approval of H-1B workers.  However, in implementing the protection for workers that the Act intends, the procedures and documentation requirements are sufficiently specific to enable investigations of complaints against employers and enforcement of sanctions where necessary.  Under the Act, protection of U.S. workers is provided through the complaint process."  56 Fed. Reg. 54,720-01; 54,721 (Oct 22, 1991).

during the relevant time period, after January 15, 2012. *Id.* at 146, 171. Thus, the resulting award only pertained to Aleutian's misconduct in paying required wage rates to its two H-1B employees. In these respects, the instant case is readily distinguishable from the facts in *Greater Missouri* in which the investigation swept broadly, concerned topics not at issue in the aggrieved party complaint and discrete violations occurring outside the twelve-month period, and resulted in findings involving more than forty employees.

Aleutian seeks a narrower application of 8 U.S.C. § 1182(n)(2)(A) so that the agency may only investigate on the specific allegations of the complaint as it pertains to the complainant. There is no such requirement in the language of the statute. Rather, both 8 U.S.C. § 1182(n)(2)(A) and 20 C.F.R. § 655.800(b) allow the DOL to tailor investigations of aggrieved party complaints appropriately in order to obtain information it finds necessary to determine whether the employer violated its obligations. Here, the Administrator found that wage information for the one other relevant H-1B employee at Aleutian was necessary, and the Court defers to the Administrator's determination with regards to the appropriate scope of investigation. Moreover, there is no statute or regulation requiring the Administrator to turn a blind eye to additional misconduct discovered during an appropriate investigation. Indeed, the Eighth Circuit recognized in its decision in *Greater Missouri* that the decision does not "dictate the exact contours of an aggrieved-party investigation" and "does not require the Secretary to ignore other potential violations it discovers in the course of a lawful investigation." 812 F.3d at 1140 (internal quotations omitted). Accordingly, the Court affirms the award in its entirety, including back wages owed to Horn.

* * *

In sum, the Court finds that in light of (1) the statutory delegation of authority to establish

a process for investigating complaints, 8 U.S.C. § 1182(n)(2)(A), (2) the regulatory grant of authority to determine the appropriate scope of such investigations, 20 C.F.R. § 655.800(b), (3) implied Congressional consent of the regulatory grant of authority, and (4) the legislative history indicating that Congress intended to allow more robust back-end investigations of H-1B employers than front-end review, it cannot be said that the DOL's determination that it is authorized to look beyond the four corners of a complaint in formulating an appropriate investigation is arbitrary, capricious, or contrary to law. To the extent this conclusion conflicts with the Eighth Circuit's decision in *Greater Missouri,* this Court respectfully disagrees with that decision. However, to the extent the DOL persists in its view, as described by the Eighth Circuit, that reasonable cause to investigate *any* violation of the H1-B program automatically justifies an "open-ended investigation of the employer and its general compliance," 812 F.3d at 1138, the Court agrees with the Eighth Circuit that no such expansive authority exists. Any investigation must by necessity be limited to the subject of the investigation. *See* 20 C.F.R. § 655.800(b) ("The Administrator . . . shall conduct such investigations as may be appropriate . . . and gather such information as deemed necessary by the Administrator to determine compliance *regarding the matters which are the subject of the investigation.*") (emphasis added).

**IV.    Conclusion**

For the aforementioned reasons, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 35, 37, and close the case.

It is SO ORDERED.

Dated:     September 28, 2017
           New York, New York

Edgardo Ramos, U.S.D.J.