# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2018

(Argued:  February 6, 2019      Decided:   September 22, 2020)

No. 17-3810

---

ALEUTIAN CAPITAL PARTNERS, LLC,

*Plaintiff-Appellant*,

–v.–

EUGENE SCALIA, sued in his official capacity, SECRETARY, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF LABOR, WAGE AND HOUR DIVISION, UNITED STATES DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATOR, UNITED STATES DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION WAGE AND HOUR DIVISION UNITED STATES DEPARTMENT OF LABOR,[*]

*Defendants-Appellees*.

---

B e f o r e :

POOLER, LOHIER, and CARNEY, *Circuit Judges*.

---

Aleutian Capital Partners, LLC ("Aleutian") appeals from the September 29, 2017 judgment of the United States District Court for the Southern District of New York (Ramos, *J.*), affirming a decision by the Administrative Review Board ("ARB") of the

---

[*] The Clerk of Court is directed to amend the caption to conform to the above.

United States Department of Labor ("DOL") concluding that Aleutian violated certain statutory and regulatory requirements governing the H-1B temporary foreign worker program (the "H-1B Program" or the "Program"), and ordering Aleutian to pay back wages to two Program workers. Aleutian challenges this order, arguing that it actually paid one of the workers the amount that he was owed during the term of his employment and that any underpayment in the first year fell outside the applicable statute of limitations. As to the second employee, Aleutian argues that DOL was not authorized to investigate the terms of her employment in the first place because she did not herself file a complaint with DOL, and the only complaint that was filed did not allege any H-1B Program violations specifically as to her employment. We reject both challenges.

AFFIRMED.

───────────────

CHRISTOPHER C. HEISENBERG, Hinckley & Heisenberg LLP, New York, N.Y. (Michael T. Stolper, The Stolper Group, P.A., New York, N.Y., *on the brief*), *for Plaintiff-Appellant*.

BENJAMIN H. TORRANCE, Assistant United States Attorney (Natasha W. Teleanu, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, N.Y., *for Defendants-Appellees*.

───────────────

CARNEY, *Circuit Judge*:

Aleutian Capital Partners, LLC ("Aleutian") appeals from the September 29, 2017 judgment of the United States District Court for the Southern District of New York (Ramos, *J.*) affirming a decision by the Administrative Review Board ("ARB") of the United States Department of Labor ("DOL"). In that decision, ARB ordered Aleutian, a private equity investment group in New York, to pay back wages to an employee and a former employee, both of whom it had hired under the H-1B temporary foreign worker program (the "H-1B Program" or the "Program").

Established by the Immigration and Nationality Act ("INA"), the H-1B Program allows employers, under closely regulated circumstances, to hire non-immigrant foreign individuals for work in certain temporary positions. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); *id.* § 1182(n)(1). Congress charged DOL with implementing the H-1B Program and enforcing the Program's standards. *Id.* § 1182(n)(2)(A).

This appeal arises from a 2013 complaint filed with DOL by one such H-1B employee—Shakir Gangjee ("Gangjee")—who alleged that Aleutian violated Program standards by underpaying him for several months of his approximately one-and-a-half year period of employment there, from August 2011 through December 2012. The ensuing DOL investigation showed that the monthly salary payments Gangjee received during that period frequently fell below the amount he was due under H-1B Program standards but, because Aleutian overpaid Gangjee in other months, the end result was that Gangjee received in total compensation for 2012 somewhat *more* than what the Program required.[1] DOL nonetheless determined that applicable regulations called for Aleutian to pay Gangjee back wages for each of the months in which it failed to remit in wages the full amount due, regardless of any bonuses or overpayments that it made in other months. *See* App'x 37-38 (citing 20 C.F.R. § 655.731).

Aleutian challenges this interpretation of the relevant statute and regulations, arguing that because by the end of the year it paid Gangjee the wage specified in its H-1B Program application—in fact, it paid Gangjee more than that wage—DOL cannot order it to pay any back wages at all. This argument failed in the agency proceedings and in the District Court, and we now affirm the District Court's judgment. Agency regulations duly promulgated under the statute unambiguously require H-1B employers to make wage payments in "prorated installments," "no less often than

---

[1] Unless otherwise specified, all references are to calendar years.

3

monthly." 20 C.F.R. § 655.731(c)(4). We therefore conclude that an employer's failure to satisfy this requirement constitutes a failure to comply with the INA's overall "required wage obligation"—a conclusion that supports DOL's award of back wages to Gangjee. *Id.*

Additionally, during its investigation of Gangjee's complaint, DOL requested that Aleutian provide wage documentation as to any other H-1B Program worker that it had employed since January 15, 2012. In response, Aleutian produced records corresponding to its employment of Minh-Thuong Horn ("Horn"), its one other H-1B employee, whom Aleutian hired in 2010 and whose employment with the company ended in early January 2013. Reviewing these records, the agency discovered that Aleutian underpaid Horn for her work in the month of December 2012, and so ordered the company to pay her back wages for that month.

On appeal, Aleutian contests the agency's authority to investigate its employment of Horn, who had not herself filed a complaint. Aleutian urges us to impose limits on DOL's investigatory authority by holding that DOL's investigation into an H-1B Program complaint may not exceed the specific allegations of misconduct made in that complaint—which would mean that the agency stepped beyond the bounds of its authority when it investigated Aleutian's employment not only of Gangjee, but also of Horn. We decline to adopt the proposed restriction. Rather, we affirm DOL's authority to investigate Aleutian's compliance with the H-1B Program's wage requirement as to Horn, as well as to Gangjee. Such an inquiry was reasonably within the scope of DOL's investigative authority into the allegations made in Gangjee's complaint and is lawfully contemplated by Program regulations.

## BACKGROUND

### I.    Legal Framework

The INA authorizes the United States Citizenship and Immigration Services ("USCIS") to issue work visas to certain non-immigrant foreign workers permitting their temporary employment in the United States in statutorily defined "specialty occupation[s]." 8 U.S.C. § 1101(a)(15)(H)(i)(b); *see also id.* § 1184(i)(3) (defining "specialty occupation" for purposes of H-1B Program). Foreign workers employed under this authority are known as "H-1B Program employees" or "H-1B workers," after the provision authorizing their temporary work visas. The H-1B Program is implemented by regulations promulgated by DOL. *See* 20 C.F.R. Part 655, subparts H and I.

Our focus here lies primarily on those statutory and regulatory provisions that establish the amount of wages an H-1B Program employee is due and when those wages must be paid. As to the amount, an employer seeking to hire under the H-1B Program must commit, in a Labor Condition Application ("LCA") filed with DOL, to paying the prospective employee at the "required wage rate." 20 C.F.R. § 655.731(a); *see also* 8 U.S.C. § 1182(n)(1)(A); 20 C.F.R. § 655.730(a) (detailing process for filing LCA). That amount is defined by statute as being the higher of (1) "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or (2) "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A); 20 C.F.R. § 655.731(a); *see also* 8 U.S.C. § 1182(p) ("Computation of prevailing wage level"). As to the timing, the regulations dictate that employers satisfy their obligation to pay the required wage when they pay "the employee, cash in hand, free and clear, when

5

due"—subject only to certain narrowly defined exceptions[2]—"prorated installments (e.g., annual salary divided into 26 bi-weekly pay periods, where employer pays bi-weekly) paid no less often than monthly." 20 C.F.R. § 655.731(c).

Also important for our purposes is the fact that the statute creates an initial presumption of an application's acceptability: So long as DOL does not find that an LCA is "incomplete or obviously inaccurate," it must certify the LCA within seven days of receipt. 8 U.S.C. § 1182(n)(1); *see also Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 193 (3d Cir. 2010) (explaining that DOL "is not generally permitted to investigate the veracity of the employer's attestations on the LCA prior to certification"). Armed with a certified LCA, the employer and employee turn to USCIS to obtain the H-1B visa itself. But though the statute provides DOL little leeway to investigate an employer *before* certifying its LCA, section 1182(n)(2) authorizes the Secretary of Labor (the "Secretary") to conduct a *post*-certification compliance investigation in response to a complaint that an employer is not meeting one or more conditions specified in the LCA. To trigger such an investigation, the complaining party—which may be "any aggrieved person or organization (including bargaining representatives)"—must submit a written complaint to the Administrator of DOL's

---

[2] An H-1B Program employee may be paid below the level of the required wage only as a result of "[a]uthorized deductions" from wages. 20 C.F.R. § 655.731(c)(9); *see also id.* § 655(c)(1). An authorized deduction "means a deduction from wages in complete compliance with one of the following three sets of criteria": (1) "Deduction which is required by law (e.g., income tax; FICA)"; (2) "Deduction which is authorized by a collective bargaining agreement, or is reasonable and customary in the occupation and/or area of employment (e.g., union dues; contribution to premium for health insurance policy covering all employees . . . )" and that was "revealed to the worker prior to the commencement of employment"; or (3) deductions that employees have explicitly and voluntarily authorized and that do not exceed "the fair market value or the actual cost (whichever is lower)" for matters "principally for the benefit of the employee" (as opposed to "a recoupment of the employer's business expense"), provided the amount deducted does "not exceed 25 percent of an employee's disposable earnings for a workweek." *Id.* § 655.731(c)(9).

Wage and Hour Division (the "Administrator"). 8 U.S.C. § 1182(n)(2)(A); 20 C.F.R. § 655.806(a). Complaints must be filed within one year of the employer's latest offending act, but DOL has authority to assess remedies for violations occurring "prior to one year before the filing of a complaint." 20 C.F.R. § 655.806(a)(5).

Should the Secretary find that an employer failed to meet a specified condition or made a material misrepresentation in its LCA, section 1182(n)(2) authorizes the Secretary to impose administrative remedies. Thus, as relevant here, "[u]pon determining that an employer has failed to pay wages" at the wage level specified in the LCA, the agency "shall assess and oversee the payment of back wages" to the affected H-1B Program employee in an amount "equal to the difference between the amount that should have been paid and the amount that actually was paid." 20 C.F.R. § 655.810(a); *see also* 8 U.S.C. § 1182(n)(2)(D).

We evaluate Aleutian's arguments against this legal landscape.

## II.    Factual Background[3]

Aleutian is a private equity investment group established in 2003 and operating in the State of New York. Beginning in 2010, and continuing through 2013, Aleutian employed two H-1B Program employees: Horn and Gangjee.

Horn was Aleutian's first H-1B Program employee: In March 2010, Aleutian submitted an LCA to support hiring her as a market research analyst. In that LCA, Aleutian represented that it would pay Horn an annual salary of $42,453—an amount that it represented as the prevailing wage for market research analysts. Although for the vast majority of her tenure, Aleutian compensated Horn monthly and at the duly

---

[3] The relevant facts are undisputed. *See* Appellant's Br. at 9 ("[T]he questions presented on this appeal are exclusively legal issues."). This statement is based on the account given in the District Court opinion, App'x 11-33, and by the ARB in its decision, App'x 34-41.

prorated amount of $3,537.75, in December 2012, the company paid her only $350. (It also made a $250.73 contribution to her healthcare plan in that month.) Then, on January 2, 2013, Aleutian terminated Horn's employment.

In August 2011, Aleutian submitted a second LCA, designed to secure Gangjee's employment as a financial analyst. It represented in the LCA that the prevailing wage for financial analysts was $62,566, but committed to paying Gangjee an annual salary of $65,000, meaning his prorated gross monthly wages should have been $5,416.67. Executives at Aleutian orally outlined to Gangjee a different agreement, however, under which Gangjee's actual monthly compensation amounted to the sum of $3,000 in "base pay" plus a "bonus" totaling 3% of Aleutian's gross revenues for the month. In other words, if Aleutian received no revenue in a given month, Gangjee received no "bonus" component of his pay and would be paid only $3,000, well below the required wage rate. This salary structure contravened H-1B Program regulations, both substantively and because it was never reduced to writing.

For the 17 months that Gangjee worked for Aleutian, he was paid the amounts that we set out in the margin.[4] As is apparent, some total monthly payments fell well

---

| [4] Month/Year | Total Paid | Month/Year | Total Paid |
|---|---|---|---|
| August 2011 | $1,875 | May 2012 | $9,456 |
| September 2011 | $1,649 | June 2012 | $3,060 |
| October 2011 | $2,649 | July 2012 | $3,060 |
| November 2011 | $2,649 | August 2012 | $3,600 |
| December 2011 | $9,822 | September 2012 | $3,060 |
| January 2012 | $5,711 | October 2012 | $3,060 |
| February 2012 | $10,266 | November 2012 | $3,060 |
| March 2012 | $5,285 | December 2012 | $3,780 |
| April 2012 | $4,111 | | |

8

below the LCA pro rata amount; others exceeded it. Gangjee's total annual compensation for 2012 was $57,509.

## III. Procedural Background

On January 14, 2013, Gangjee filed a complaint with DOL, alleging that Aleutian generally "failed to pay nonimmigrant worker(s) the higher of the prevailing or actual wage," and specifically with respect to him that, from August 6, 2011, to December 31, 2012, it failed to pay his wages as required by the H-1B Program. App'x 35 (internal quotation marks omitted).[5] Based on the complaint's allegations, DOL concluded that there was reasonable cause to believe that the described violations had occurred, and therefore launched an investigation. In the course of that investigation, the agency requested from Aleutian the H-1B Program documents and payroll records for all H-1B Program workers that it employed after January 15, 2012 (the date one year before Gangjee filed his complaint). Aleutian duly produced its payroll records for Gangjee and for Horn, which showed the shortfalls and discrepancies described above.

On January 9, 2014, almost one year later, the agency issued a notice of determination. The notice first observed that the prorated monthly installment for Gangjee's prevailing wage rate of $62,566 (as identified in Aleutian's LCA) was $5,213.82—meaning that for every month in which Gangjee was owed full wages, he was due $5,213.82. It then calculated the amount that Gangjee was actually owed for 2012, taking into account Gangjee's use of vacation or sick days (usage that reduced sums due to Gangjee for August and September 2012). The agency concluded that, after

---

[5] The complete administrative record, including Gangjee's administrative complaint, was filed under seal in the District Court, *see* App'x 14, but was not submitted in connection with this appeal. The ARB's decision does quote from Gangjee's complaint, however, and as we noted, neither party contests the facts.

these modifications, Gangjee was due a total salary in 2012 of $49,370.99—an amount significantly less than the $57,509 that Aleutian actually paid Gangjee in that year.

But the agency also found that Aleutian underpaid Gangjee for each of four months in 2011 and six months in 2012.[6] It calculated the deficit—*i.e.*, the difference between the pro rata amount of $5,213.82 and the amount Aleutian actually paid to Gangjee—for each of those months and concluded that Aleutian owed him $22,713.31 for the accumulated monthly underpayments. It gave Aleutian no credit for overpayments made in any other months, notably including the two months (August and September 2012) in which it paid Gangjee when it owed him no salary.

Aleutian appealed the decision to an Administrative Law Judge ("ALJ"), urging that an employer's statutory "required wage obligation" under the H-1B Program should be calculated on an annual, rather than monthly, basis, and contending also that DOL lacked jurisdiction to order payment of back wages to Gangjee for 2011, and to Horn, at all. On July 9, 2014, the ALJ granted the agency's motion for summary decision and directed Aleutian to pay the full amount of back wages as calculated by the agency. The ALJ concluded that Aleutian was required to pay Gangjee and Horn at least one-twelfth of their annual certified salaries every month and that the failure to do so in a given month could not be excused by paying bonuses in other months. The ALJ further determined that no time bar precluded the agency from investigating the terms of Gangjee's employment with Aleutian more than one year before Gangjee filed his complaint. Finally, the ALJ rejected Aleutian's argument that Gangjee's complaint provided insufficient cause for the agency to investigate Aleutian's compliance with the

---

[6] Underpayments occurred, it said, in August, September, October, and November 2011, and in April, June, July, October, November, and December 2012.

10

H-1B Program as to Horn's employment, even in the absence of a complaint filed by Horn.

Aleutian next sought review of the ALJ's decision by the three-member ARB; the ARB affirmed the ALJ's order in its entirety.[7] With regard to the agency's authority to investigate Horn's employment, the ARB declined to follow an Eighth Circuit decision relied on by Aleutian as a basis for limiting the agency's investigation in response to an aggrieved party's complaint to the allegations in that complaint. *See Greater Missouri Medical Pro-Care Providers, Inc. v. Perez*, 812 F.3d 1132, 1138-41 (8th Cir. 2015).

One ARB member (Corchado, *J.*) dissented in part as to the monthly payment amount due under 20 C.F.R. § 655.731(c)(4). In the dissent's view, that Aleutian "[v]iolat[ed] the timing requirement throughout 2012 does not automatically mean that Aleutian failed to ultimately pay the amount owed in 2012" pursuant to the "annual wage obligation," *i.e.*, 20 C.F.R. § 655.731(c)(2). App'x 40. Because there was no dispute that in 2012 Aleutian paid Gangjee an amount above the total wages due under the LCA, the dissent reasoned, Gangjee was not entitled to back wages at all. Rather, he wrote, an employer does not violate 20 C.F.R. § 655.731(c) so long as that employer's wage payments do not cumulatively fall behind the pro rata amount owed for the year (*e.g.*, 1/12th by January, 2/12th by February, 3/12th by March, etc.). In other words, according to the dissent, section 655.731(c) allows employers to overpay their H-1B Program employees early in the year, and then underpay in later months, while also prohibiting the inverse: underpayment early in the year and overpayments later. Under this theory, the dissent concluded, Aleutian violated the "timing requirement" with respect to its wage obligation to Gangjee during 2011 overall and during the fourth

---

[7] The ALJ subsequently recalculated the amount Aleutian owed Gangjee as $22,713.30, a correction that the ARB accepted in its order.

quarter of 2012, but Gangjee was entitled to back wages only for 2011—the year in which Gangjee was undisputedly paid less than the amount Aleutian committed to pay him in the LCA.

In June 2016, Aleutian sued DOL in federal district court, asserting claims under the Administrative Procedure Act ("APA") and generally challenging the ARB ruling. In 2017, the District Court affirmed the ARB's ruling in all respects, granting summary judgment for DOL. As relevant to this appeal, the District Court ruled first that to satisfy its "required wage obligation," Aleutian had to pay its H-1B employees monthly prorated installments of a calculated minimum amount. This meant that Aleutian owed Gangjee back wages for each of the months of underpayment in 2012 notwithstanding that he was overpaid when viewed over the year. Second, it ruled that DOL could award remedies for violations that occurred earlier than the start of the one-year limitations period, and thus could award Gangjee back wages dating from 2011. Third, it rejected Aleutian's challenge to DOL's investigation of Horn's compensation and backpay award for December 2012, concluding that the statute authorized both.

Aleutian timely appealed.

## DISCUSSION

The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Section 706 of the APA authorizes courts to review *de novo* "all relevant questions of law" and "interpret[ations] [of] constitutional and statutory provisions" made by an agency. 5 U.S.C. § 706; *see also J. Andrew Lange, Inc. v. Fed. Aviation Admin.*, 208 F.3d 389, 391 (2d Cir. 2000). Where, as here, an APA-based challenge to an agency's action presents a pure question of law, a district court's procedural decision to award

12

summary judgment is generally appropriate. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001). We review *de novo* such a grant. *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007). Further, where the challenge to agency action disputes the agency's interpretation of a statute that Congress has designated for administration by the agency, we apply the analytical framework articulated in *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984), to determine whether and, if so, how much to defer to the agency's interpretation.

The *Chevron* framework recognizes that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("*Brand X*").[8] In interpreting such a statute, *Chevron* thus requires that we first determine "whether the statute is ambiguous or silent on the specific question at issue." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 168 (2d Cir. 2017). If we conclude that the statute is ambiguous or silent then, so long as "the implementing agency's construction is reasonable," we will "accept the agency's construction of the statute, even if the agency's reading differs from what [we] believe[] is the best statutory interpretation." *Brand X*, 545 U.S. at 980.

## I.     The H-1B Program's "Required Wage Obligation"

Aleutian maintains that the INA does not authorize DOL to order it to pay Gangjee back wages for the months in 2012 in which it paid him less than the pro rata monthly amount because the record leaves no doubt that, over the course of that year, it paid Gangjee more than it committed to in the LCA. In support, it points out that the INA authorizes imposition of a backpay remedy only after an agency determination

---

[8] Unless otherwise indicated, this Opinion omits from text quoted from judicial opinions any alterations, citations, and internal quotation marks.

"that an employer has not paid wages *at the wage level specified under the [LCA].*" 8 U.S.C. § 1182(n)(2)(D) (emphasis added). Because the LCA that Aleutian filed for Gangjee characterized his salary as an annual rather than a monthly wage, and because Aleutian undisputedly paid Gangjee more than he was owed for 2012, Aleutian contends that it did in fact pay wages at "the wage level specified under the [LCA]," as required, and therefore cannot be ordered to pay back wages for any month in 2012. We thus turn to examining the meaning of "at the wage level specified under the [LCA]" as it is used in section 1182(n)(2)(D).

As we have explained, and as the parties do not dispute, the *Chevron* framework governs our analysis. Accordingly, we observe at step one that the INA is silent as to when the amount to be paid during each pay period must be calculated. *See id.* § 1182(n). But through the INA, Congress delegated to DOL the authority to "establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an [LCA]." *Id.* § 1182(n)(2)(A). The INA also charges DOL with receiving, reviewing for completeness and accuracy, and certifying LCAs filed by employers. *Id.* § 1182(n)(1). Under this authority, DOL promulgated regulations to ensure that employers participating in the H-1B Program comply with the LCAs that they file. *See* 20 C.F.R. § 655.731. These regulations—and specifically section 655.731, which describes the "required wage obligation"—fill the statutory gap.

Step two requires a closer examination of these regulations. The key criteria established by them, at least for our purposes, are that H-1B Program employees' wages must be paid "cash in hand, free and clear, when due." 20 C.F.R. § 655.731(c)(1). Notably, the phrase "when due" appears in the regulations both as a directive to employers that "the required wage . . . be paid . . . when due," *id.*, and also as a *definitional* element, providing that "cash wages paid" is to be understood as

"consist[ing] *only* of those payments . . . disbursed to the employee . . . when due," *id.*
§ 655.731(c)(2) (emphasis added). In other words, wages that are not paid "when due"
have not been paid in accordance with section 655.731, and cannot be considered "cash
wages paid." Thus, if an employer does not pay the required wage "when due," it has
not satisfied the H-1B Program's "obligation" to pay that "required wage." Not
incidentally, section 655.731(c) also defines when H-1B Program wages are "due": For
salaried employees (like Gangjee and Horn), "wages will be due in prorated
installments . . . paid no less often than monthly." *Id.* § 655.731(c)(4). That the
regulations are so explicit as to the nature and timing of the required wage payments
("in prorated installments" and "when due," which can be "no less often than
monthly") provides an important indicator as to how an employer's statutory wage
obligation should be understood.

Aleutian counters with the policy argument that this application is "unsound"
because it "precludes an employer from self-remedying any deficiencies by restoring
those wages to the employee." Appellant's Br. at 12. That employers of H-1B Program
workers cannot "self-remedy" their failure to pay their employees on time without
incurring a penalty from DOL, however, is precisely the aim of the regulatory scheme:
The point is to require *monthly* payments of a certain level, not one *annual* payment—
certainly a reasonable requirement from the employee's point of view and sensible from
both immigration and labor law perspectives.

Indeed, a primary goal of U.S. non-immigrant foreign worker programs like the
H-1B Program is to ensure that "the employment of the foreign worker in the job
opportunity will not adversely affect the wages or working conditions of similarly
employed U.S. workers." 20 C.F.R. § 655.0(a)(1). Those DOL regulations to which we
have referred advance this goal by ensuring that H-1B Program employees are paid in a
consistent and predictable manner. This policy prevents employers from replacing

15

domestic workers with foreign workers who, lacking the same labor protections, are vulnerable to being paid according to the vagaries of the employer's balance sheet rather than in a standard manner comparable to a domestic worker. A policy that allowed for employers to "self-remedy" months of underpayment with a later bulk payment would not require consistent, predictable payment of wages at all, and would disadvantage domestic workers, contrary to the aims of the Program. DOL's interpretation that an employer must make monthly, prorated wage payments to fulfill its obligation to pay an H-1B Program employee at "the wage level specified in the [LCA]," 8 U.S.C. § 1182(n)(2)(D), is a reasonable one in light of these aims, and we accordingly afford that interpretation *Chevron* deference.[9]

It is a closer question, however, whether allowing an employer to credit an overpayment made in an earlier pay period against an underpayment in a later period runs afoul of the "required pay obligation"—the situation considered by the dissenting member of the ARB, as we have mentioned. On a monthly, pro rata basis, Gangjee was overpaid in the early months of 2012 (January, February, and May); in the remaining months, however, he was paid far below what he was owed. Aleutian urges us to follow the dissent's reasoning:

---

[9] Aleutian argues in the alternative that it did not violate the timing requirement with respect to Gangjee's salary because its payment scheme involved "nondiscretionary" supplemental payments and thus fell within the exception to the monthly payments required by 20 C.F.R. § 655.731(c)(4). Section 655.731(c)(4) does permit employers to "use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus)," but it allows employers to do so only if documentation demonstrates their "commitment to make such payment," "the method of determining the amount" of such supplemental payments, and, "unequivocally[,] that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period." *Id.* Aleutian's argument thus fails because, insofar as it had a bonus-based payment plan for Gangjee, that plan was not established in any document.

> [A]s long as Aleutian cumulatively paid at least 1/12th in January, 2/12ths in February, 3/12ths in March, etc., it would comply with the requirement that no less than 1/12[th] be paid throughout the year. If Aleutian had cumulatively paid only 5/12ths of the LCA obligation by the end of June, it would have violated the protection offered by the pro rata requirement. I agree with Aleutian that the Administrator is penalizing Aleutian for paying more than was required in the first quarter of the year.

App'x 40. The argument has some intuitive force: If, for example, Aleutian paid Gangjee his entire annual wage for 2012 on January 1 of that year, it may seem odd that the statute would nevertheless allow Gangjee to recover back wages for the subsequent eleven months.

The monthly payment requirement, however, provides strong support for the inference that the regulatory scheme intends to provide consistent, predictable payment for H-1B Program employees and penalize inconsistency, even in the event that overpayments are made in advance. Payments must be made "*no less often than monthly.*" 20 C.F.R. § 655.731(c)(4) (emphasis added). The plain text of this provision bars an employer from paying wages at lengthy or irregular intervals, whether the payments are large or small. Moreover, that section 655.731(c)(4) allows irregular payment schemes only under exceptional circumstances and only when an employer complies with relatively restrictive conditions further supports the inference that the regulation prizes consistency and predictability in wage payments made over ensuring that an employer has paid the correct cumulative amount in a given year.

The District Court applied *Auer* deference to conclude that the ARB's determination that "each pay period must be viewed separately, and that no credit can be given for overpayments in certain months" was a reasonable interpretation of the DOL's own regulations. App'x 24 (discussing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). As the Supreme Court recently clarified in *Kisor v. Wilkie*, however, a court should

17

apply *Auer* deference only after having exhausted all of the "traditional tools of construction" to determine that a rule or regulation is "genuinely ambiguous." 139 S. Ct. 2400, 2416 (2019). Having considered the "text, structure, history, and purpose," *id.* at 2424, of the H-1B Program regulations at issue—those "traditional tools of construction"—we are of the view that section 655.731(c)(4) is not ambiguous, and *Auer* deference is not called for. The plain text of the regulation requires wages to be paid on time ("when due"), and "no less often than monthly," "in prorated installments." An employer violates both the regulation's timing and the pro-rata installment requirements when it makes a monthly payment that is less than one-twelfth of the established annual wage—even if the employer has not fallen behind in, or is ahead of, its obligation to pay, pro rata, the annual amount owed to an employee. In running afoul of these regulatory wage requirements, the employer also violates its obligation to pay the wage "specified in [the] [LCA]," 8 U.S.C. § 1182(n)(2)(A), and becomes liable for back wages for each month in which it so fails. We therefore affirm the decision of the District Court. *See Brand X*, 545 U.S. at 980.

## II.     The Permissible Scope of the Agency's Investigation and Payment Order

Aleutian also argues that DOL acted outside its statutory authority when it investigated and ordered payments regarding Gangjee's employment in 2011 and Horn's in December 2012. According to Aleutian, the one-year statute of limitations set forth in 20 C.F.R. § 655.806(a)(5) for aggrieved-party complaints precluded DOL from taking investigatory action and making payment orders with respect to any time before the one year immediately preceding the submission of Gangjee's complaint in January 2013. Since Gangjee was precluded from raising incidents as to 2011, Aleutian reasons, the agency was, too. As to Horn, Aleutian contends that DOL had no authority to investigate the terms of her employment at all, because Gangjee's complaint included no allegations regarding her situation. As we explain below, we conclude that DOL

acted within the scope of its authority in investigating the terms of Gangjee's 2011 employment and Horn's employment in 2012.

A.    Gangjee's Compensation for 2011

Because Gangjee filed his complaint on January 14, 2013, Aleutian argues, DOL's statutory authority allowed it to investigate underpayment and authorize back wages only as far back as January 14, 2012. We are not persuaded.

The INA provides that "[n]o investigation or hearing shall be conducted on a complaint concerning" an employer's failure to meet an obligation under the LCA "unless the complaint was filed not later than 12 months after the date of the failure." 8 U.S.C. § 1182(n)(2)(A). The statute does not, however, limit DOL's authority to assess remedies. Promulgated under DOL's statutory directive, *see* 8 U.S.C. § 1182(n)(2)(A), the procedures that govern the filing and processing of complaints are published in 20 C.F.R. § 655.806. Section 655.806 reiterates, as a jurisdictional concept, that the statute imposes a one-year limitation on the filing of complaints. *See* 20 C.F.R. § 655.806(a)(5). Critically, however, it further provides that "[t]his jurisdictional bar does not affect the scope of the remedies which may be assessed." *Id.* Indeed, the regulation offers this clarification: "Where, for example, a complaint is timely filed, back wages may be assessed for a period prior to one year before the filing of a complaint." *Id.*

Section 655.806(a)(5) thus squarely addresses and allows DOL to award back wages for Aleutian's underpayment of Gangjee in 2011. We think it reflects a reasonable interpretation of DOL's statutory directive to adopt the position that, where an investigation into a timely filed complaint reveals that an employer's failure to conform to an LCA has resulted in a pattern of underpayment that extends earlier than the statute of limitations cut-off, DOL may assess back wages that remedy the full scope of that failure. *See Brand X*, 545 U.S. at 980.

19

B.    Investigation of Horn's Employment

Finally, relying on the Eighth Circuit's decision in *Greater Missouri Medical Pro-Care Providers, Inc. v. Perez*, 812 F.3d 1132 (8th Cir. 2015), Aleutian submits that 8 U.S.C. § 1182(n)(2)(A) authorizes DOL to conduct compliance investigations only into specific allegations made in an aggrieved party's complaint, and therefore (it argues) DOL violated that section by requesting documents from Aleutian that did not concern Gangjee, with the result that the portion of its order that concerns Horn cannot be sustained.

Although, as we noted, the INA does not contemplate that DOL will conduct a comprehensive review before certifying LCAs—presumably to allow relatively expeditious approval and employment, and in reliance on the availability of after-the-fact compliance checks—DOL may conduct compliance investigations as follows: (1) upon receiving a complaint by an "aggrieved person," 8 U.S.C. § 1182(n)(2)(A); (2) for "random investigations" of certain employers, *id.* § 1182(n)(2)(F); (3) after the Secretary personally certifies that he has "reasonable cause" to believe an employer is non-compliant, *id.* § 1182(n)(2)(G)(i); or (4) upon receiving "specific credible information" from a reliable source of a willful violation of certain requirements, *id.* § 1182(n)(2)(G)(ii). The record is clear that Horn did not file a complaint; that Gangjee's complaint did not mention any underpayment specifically as to Horn; and that DOL discovered the underpayment in the course of its investigation into Gangjee's allegations, after it requested documentation relating to all of Aleutian's H-1B Program employees.

The scope of DOL's investigatory authority presents a question of first impression in our Circuit but, in its 2015 decision in *Greater Missouri*, the Eighth Circuit opined on the question. *See* 812 F.3d at 1138-41. In that case, an H-1B Program employee filed an "aggrieved party" complaint against her employer alleging several H-1B

Program violations. *Id.* at 1134. The DOL investigator found "reasonable cause" to investigate only the allegation that the employer sought to recover a fee after the H-1B Program employee's early termination of her employment contract. *Id.* Based on this single alleged violation, however, the investigator—purportedly "[i]n accordance with the DOL's standard practice for all H-1B investigations"—"initiated a full investigation under the H-1B provisions of the [INA] . . . to see if there were [any Program] violations [as] to *any* employee." *Id.* (emphasis added). As part of this full investigation, DOL requested—without any temporal or other limitation—all the employer's "H-1B documents and records, including LCAs for all of [the employer]'s H-1B employees," of which there were at least 45. *Id.* at 1134; *see id.* at 1135. After reviewing these records, the Secretary ultimately awarded back pay to 45 employees for three different violations of H-1B Program requirements.

Attempting to justify the apparently unlimited scope of the investigation, the Secretary took the position that the "finding of reasonable cause to investigate just one allegation by an aggrieved party automatically justifies a comprehensive investigation of the employer as a whole . . . [and its] compliance . . . in general." *Id.* at 1137. The DOL investigator in charge of the investigation further offered that it was "standard practice" for DOL "to conduct a full investigation every time the DOL does an investigation of any sort under H[-1B]." *Id.* at 1138.

The Eighth Circuit rejected this far-reaching interpretation of DOL's jurisdiction. It held that the plain language of section 1182(n)(2)(A) does not "authorize an open-ended investigation of the employer and its general compliance without regard to the actual allegations in the aggrieved-party complaint." *Id.* Rather, the court ruled, section "1182(n)(2)(A) expressly ties the Secretary's initial investigatory authority to the complaint and those specific allegations . . . for which the Secretary finds 'reasonable cause to believe' the employer committed the alleged violation." *Id.* It declined,

however, to answer the question whether the Secretary may modify or expand an investigation based on an aggrieved-party complaint if "additional violations . . . come to light during a lawfully initiated and properly limited aggrieved-party complaint investigation." *Id.* at 1139.

The government contends, and we agree, that Aleutian overreads *Greater Missouri*. Once a complaint that warrants investigation is filed (*i.e.*, one that is timely and that sets forth factual allegations sufficient to provide "reasonable cause to believe" that a violation has occurred, 8 U.S.C. § 1182(n)(2)(A)), DOL has greater authority than Aleutian suggests to define the scope of that investigation. Because section 1182(n)(2)(A) contains a "statutory delegation of adjudicative power" that "signals a delegation of interpretive authority by Congress," *Nielsen v. AECOM Tech Corp.*, 762 F.3d 214, 219-20 (2d Cir. 2014), DOL's statutory interpretations made under that delegation warrant deference. Those interpretations include 20 C.F.R. § 655.800(b), which provides:

> The Administrator, either pursuant to a complaint or otherwise, shall conduct such investigations as may be appropriate and, in connection therewith, enter and inspect such places and such records (and make transcriptions or copies thereof), question such persons and gather such information as deemed necessary by the Administrator to determine compliance regarding the matters which are the subject of the investigation.

Section 655.800 thus claims for DOL broad discretion to gather the information that it "deem[s] necessary" to determine an employer's "compliance regarding the matters which are the subject of the investigation." Doing so may require determining whether an employer subject to an aggrieved-party complaint has also applied an unlawful practice to other Program employees. That interpretation is consonant with the authorizing INA provision, which grants DOL the authority to "establish a process" for conducting investigations. 8 U.S.C. § 1182(n)(2)(A). Moreover, adopting Aleutian's

position would hinder the general scheme of the H-1B Program, which allows for an expedited application process—effectively barring DOL from reviewing LCAs for more than facial completeness and accuracy—to ensure that employers can meet their employment needs, while enforcing compliance through more robust back-end investigations. *See* Labor Condition Applications and Requirements for Employers Using Aliens on H-1B Visas in Specialty Occupations, 56 Fed. Reg. 54,720-21 (Oct. 22, 1991) (explaining that goal of announced regulations is to ensure that employers are not unnecessarily hindered in hiring on a timely basis, and that worker protections will be ensured through later investigations).

As the dissenting ARB member wrote, concurring in the majority's decision *not* to adopt a broad reading of *Greater Missouri*, the limitations set forth in section 1182(n)(2)(A) exist "to prevent arbitrary or improper targeting of H-1B employers." App'x 41. Once a timely and potentially meritorious complaint alleging violations of the LCA wage obligation has been filed, it is reasonable—and not arbitrary or improper— for DOL to seek information from the employer to ensure that it is not applying the same unlawful practices to other H-1B Program employees. *See Brand X*, 545 U.S. at 980.

Our conclusion affirming DOL's authority to investigate Aleutian's treatment of Horn does not conflict with the Eighth Circuit's analysis in *Greater Missouri*. The *Greater Missouri* court declared that DOL can investigate the employer's "specific misconduct as alleged in the complaint." 812 F.3d at 1138. Where the "specific misconduct" alleged in a complaint is that the employer is using a wage payment practice that is impermissible under the H-1B Program, then an investigation into that "specific misconduct" would in our view reasonably include payroll information about the employer's one other H-1B Program employee, to determine whether the impermissible practice is being applied to her as well.

Indeed, in *Greater Missouri* the Eighth Circuit rejected an especially expansive interpretation of the Secretary's investigatory authority that the government does not advance here. As noted above, the Secretary took the position in that case that it could conduct a "full investigation every time the DOL does an investigation of any sort under H-1B, to determine if any violations exist under H-1B and to see if there are violations to any employee during the relevant time period." *Id.* The government asserts no such sweeping investigative authority here. We therefore conclude that, where a complaint gives the Secretary "reasonable cause to believe" that an employer has failed to meet its obligations under the H-1B Program in a particular manner, 8 U.S.C. § 1182(n)(2)(A) and 20 C.F.R. § 655.800(b) permit the agency to investigate the full scope of that potential failure, including victims and circumstances that were not the subject of any specific allegation.

Here, the record does not indicate that the agency undertook an "open-ended investigation of the employer and its general compliance without regard to the actual allegations" in the complaint, as the Eighth Circuit charged in *Greater Missouri*. 812 F.3d at 1138. Rather, the agency inquired to see whether Aleutian's alleged failure to satisfy the required wage obligation extended beyond Gangjee to the one other H-1B Program worker employed in the same time frame. We assume outer limits on the agency's investigatory authority. But, on these facts, we can comfortably conclude that the investigation undertaken by DOL falls well within those bounds.

## CONCLUSION

We have considered, and reject, Aleutian's other arguments. The judgment of the District Court is **AFFIRMED**.